**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| OWENS & MINOR DISTRIBUTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:23-CV-109 (Kleeh) |
| | ) | |
| v. | ) | |
| | ) | |
| WESTRIDGE COMMERCE CENTRE | ) | |
| DEVELOPMENT 2E, LLC, | ) | ELECTRONICALLY FILED |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AND DEFENDANT'S COUNTERCLAIMS AGAINST PLAINTIFF

Defendant, WestRidge Commerce Centre Development 2E, LLC ("WRCCD" or "Defendant"), by and through its undersigned counsel, hereby files the following Answer and Affirmative Defenses to Plaintiff's Complaint and Defendant's Counterclaims Against Plaintiff.

The numbered paragraphs below correspond to the like-numbered paragraphs of the Complaint filed by Owens & Minor Distribution, Inc. ("O&M" or "Plaintiff").  Unless specifically admitted herein, WRCCD denies each factual allegation in the Complaint.

### INTRODUCTION

1.      The allegations in Paragraph 1 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

### PARTIES, JURISDICTION, AND VENUE

2.      Admitted upon information and belief.

3.      Denied. WRCCD is a Delaware LLC.

4.      Admitted.

5.      Admitted.

6.     The allegations in Paragraph 6 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

7.     Admitted in part and denied in part.  It is admitted that jurisdiction and proper venue in this Court were agreed upon by the parties. The remaining allegations are denied as they characterize or otherwise relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

## FACTUAL BACKGROUND

8.     After reasonable investigation, WRCCD lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 8 and, therefore, denies the same.

9.     After reasonable investigation, WRCCD lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 9 and, therefore, denies the same.

10.     After reasonable investigation, WRCCD lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 10 and, therefore, denies the same.

11.     Admitted in part and denied in part.  It is admitted that O&M entered into a lease with WRCCD. The remaining allegations are denied as they characterize or otherwise relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

12.     The allegations in Paragraph 12 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

13.     The allegations in Paragraph 13 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

14.     Admitted in part and denied in part.  It is admitted that construction included significant site work, generally, which included a wide range of undertakings. The remaining

allegations are denied as they characterize or otherwise relate to a writing which speaks for itself. To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

15.     Denied.

16.     Admitted in part and denied in part.  It is admitted that WRCCD immediately requested additional design input from O&M, which was required under the Lease, but which, despite repeated requests, O&M did not provide. The remaining allegations are denied as stated.

17.     Denied.

18.     Denied.

19.     Admitted in part and denied in part.  It is admitted that O&M provided a projected budget for the Project that was not, and could not be, finalized without necessary direction, comments and approvals from O&M, which despite repeated requests, O&M did not provide. The remaining allegations are denied as stated.

20.     Denied.

21.     Denied.

22.     Admitted in part and denied in part.  It is admitted that WRCCD assured O&M that it was fully capable of obtaining financing and completing the required work subject to O&M's material delays. The remaining allegations are denied as stated.

23.     Admitted in part and denied in part.  It is admitted that, as of December 2022, WRCCD had not closed on construction financing due to O&M's material delays. The remaining allegations are denied as stated.

24.     Denied.

25.     Denied.

26.     The allegations in Paragraph 26 relate to a writing which speaks for itself.   To the extent the allegations mischaracterize the contents of the writing, the allegations are denied. The allegations in Paragraph 26 are also legal conclusions to which no response is required.    To the extent a response is required, the allegations are denied.

27.     The allegations in Paragraph 27 relate to a writing which speaks for itself.   To the extent the allegations mischaracterize the contents of the writing, the allegations are denied. The allegations in Paragraph 27 are also legal conclusions to which no response is required.    To the extent a response is required, the allegations are denied.

28.     Denied.

29.     Denied.

30.     Admitted in part and denied in part. It is admitted that site work started in the Spring of 2023. The remaining allegations are denied as stated.

31.     The allegations in Paragraph 31 relate to a writing which speaks for itself.   To the extent the allegations mischaracterize the contents of the writing, the allegations are denied. The allegations in Paragraph 31 are also legal conclusions to which no response is required.    To the extent a response is required, the allegations are denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     The allegations in Paragraph 35 are legal conclusions to which no response is required.   To the extent a response is required, the allegations are denied.

36.     Denied.

37.     The allegations in Paragraph 37 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

38.     The allegations in Paragraph 38 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

39.     The allegations in Paragraph 39 are legal conclusions to which no response is required.   To the extent a response is required, the allegations are denied.

40.     The allegations in Paragraph 40 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

41.     The allegations in Paragraph 41 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

42.     The allegations in Paragraph 42 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

43.     The allegations in Paragraph 43 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

44.     The allegations in Paragraph 44 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

45.     The allegations in Paragraph 45 relate to a writing which speaks for itself.  To the extent the allegations mischaracterize the contents of the writing, the allegations are denied.

**COUNT ONE**
**(Declaratory Judgment – Breach of Lease)**

46.     Paragraph 46 is a statement of incorporation to which no response is required.

47.      The allegations in Paragraph 47 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

48.     The allegations in Paragraph 48 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

49.     The allegations in Paragraph 49 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

50.     The allegations in Paragraph 50 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

51.     The allegations in Paragraph 51 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

52.     The allegations in Paragraph 52 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

53.     The allegations in Paragraph 53 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

## COUNT TWO
### (In the Alternative, Rescission of the Lease)

54.     Paragraph 54 is a statement of incorporation to which no response is required.

55.     The allegations in Paragraph 55 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

56.     The allegations in Paragraph 56 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

57.     The allegations in Paragraph 57 are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

## STATEMENT OF PRECISE RELIEF SOUGHT

58.     WRCCD denies the allegations set forth in Plaintiff's Statement of Precise Relief Sought, including all subparts and further denies that Plaintiff is entitled to any relief whatsoever.

## PRAYER FOR RELIEF

WHEREFORE, WRCCD demands judgment in its favor and against O&M and respectfully requests that the Complaint be dismissed, that O&M's claims be denied in their entirety and that the Court award WRCCD attorneys' fees, costs, and expenses incurred in this action, pursuant to Addendum 3, Section 21 of the Lease, and for such other and further relief as the Court deems just and proper.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

WRCCD reserves the right to assert any and all applicable defenses to Plaintiff's claims. WRCCD has not yet obtained discovery from Plaintiff in connection with this action and, therefore, reserves the right to amend or otherwise supplement this pleading.  Without limiting the generality of the foregoing and without regard to other defenses, WRCCD sets forth the following affirmative defenses within the meaning of Fed. R. Civ. P. 8(c), as well as additional defenses, but does not assume the burden of proof of any such defense except as required by applicable law with respect to the particular defense asserted.

1.      Plaintiff's Complaint fails to state a claim upon which relief may be granted.

2.      WRCCD has properly performed all of its obligations under the Lease and has at all times acted in good faith in conformance therewith.

3.      Plaintiff fails to establish that this dispute qualifies for declaratory judgment pursuant to 28 U.S. Code § 2201.

4.      Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, consent, waiver, estoppel, unclean hands, release, or other equitable defenses.

5.      Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

6.      Plaintiff's claims are barred, in whole or in part, because certain prerequisites and/or conditions precedent had not been met or satisfied.

7.      Plaintiff's claims are barred, in whole or in part, by Plaintiff's own conduct.

8.      Plaintiff's claims are barred, in whole or in part, by Plaintiff's breach of the Lease.

9.      Plaintiff's claims are barred, in whole or in part, by Plaintiff's anticipatory repudiation of the Lease.

10.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's own breach of the implied duty of good faith and fair dealing.

11.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to properly notify WRCCD of its alleged breach and to provide sufficient time for WRCCD to cure the alleged breach.

12.     Plaintiff has not incurred any actual injury or damages.

13.     Plaintiff failed to mitigate its injury or damages, to the extent they existed.

14.     Plaintiff is not entitled to recover any damages, including compensatory damages, consequential damages, liquidated damages, exemplary damages, penalties, attorneys' fees, interest, or costs.

15.     The injuries or damages, if at all, caused to Plaintiff are attributed to the actions or omissions of some other third party and not WRCCD.

16.     The injuries or damages, if at all, caused to Plaintiff are attributed to Plaintiff's own decisions, indecisions, actions or omissions or by those of its agents, representatives or consultants.

17.     The injuries or damages, if at all, caused to Plaintiff are attributed to independent intervening causes which had no relation in fact to any conduct of WRCCD.

18.     WRCCD reserves the right to amend its pleadings, to add defenses and affirmative defenses, to add counterclaims and third-party defendants, and to argue legal theories in addition to or in lieu of those specifically identified herein, as the facts in this matter may warrant, including, without limitation, additional or further facts hereafter disclosed through discovery.

## PRAYER FOR RELIEF

WHEREFORE, WRCCD demands judgment in its favor and against O&M and respectfully requests that the Complaint be dismissed, that O&M's claims be denied in their entirety and that the Court award WRCCD attorneys' fees, costs, and expenses incurred in this action, pursuant to Addendum 3, Section 21 of the Lease, and for such other and further relief as the Court deems just and proper.

## DEFENDANT'S COUNTERCLAIMS AGAINST PLAINTIFF

Defendant, WRCCD, by and through its undersigned counsel, hereby files the following Counterclaims against O&M.  For its Counterclaims against O&M, WRCCD states as follows:

## PARTIES

1.     WRCCD is a private, local, family-owned development company with its principal place of business in Morgantown, West Virginia.

2.     O&M is a Virginia corporation with its principal place of business in Mechanicsville, Virginia.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between O&M, a citizen of the Commonwealth of Virginia, and WRCCD, a citizen of the State of West Virginia.  In addition, the amount in controversy

between the parties exceeds $75,000.00, as the dispute relates to a commercial development and related lease worth several million dollars.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

5.      Indeed, the United States District Court for the Northern District of West Virginia embraces the location of the commercial development which is the subject of this dispute.

## INTRODUCTION

6.      O&M entered into a written Lease agreement with WRCCD pursuant to which WRCCD would construct a build-to-suit commercial building with certain specifications for O&M and O&M would pay WRCCD rent over the course of the ten-year term of the Lease to compensate WRCCD for the construction and subsequent occupancy during the term of the Lease.

7.      Because the building was specifically for O&M, the Lease required O&M to make timely decisions as to certain building specifications and the construction of the building was dependent on those O&M decisions.

8.      In breach of its obligations under the Lease, O&M repeatedly failed to make necessary decisions and thereby caused a series of delays, which obstructed the progress of the construction and which delayed and/or precluded WRCCD from performing its obligations under the Lease and from receiving the benefit of the same.

9.      Despite O&M directly causing such delays by its failure to make decisions and act in good faith, O&M now improperly seeks to hold WRCCD accountable for the lack of progress and to improperly terminate and be excused from its obligations under the Lease.

10.     Indeed, O&M caused the very delays which O&M now suggests provide an excuse for it to avoid its contractual obligations under the Lease.

11.      As a result of O&M's conduct and actions, WRCCD has been damaged as set forth herein and seeks an award of monetary damages from O&M.

## RELEVANT FACTS

### O&M Executed the Lease in the Summer of 2022 Following Months of Indecision

12.      In or around November 2021, upon information and belief, West Virginia United Health System, Inc. ("WVU Medicine") awarded a contract to O&M for O&M to provide WVU Medicine certain medical products for a period of ten (10) years.

13.      WVU Medicine's contract required Owens & Minor to build, or lease and cause to be built, a facility within north-central West Virginia, a requirement that was motivated in large part by WVU Medicine's desire to stimulate economic development via the addition of a new, medical supply facility in a region that in 2021 was absorbing the official closure of a large, longstanding pharmaceutical manufacturing plant.

14.      In the months of negotiations leading up to O&M and WVU Medicine's contract execution, O&M initiated discussions with WRCCD, in order to satisfy WVU Medicine's request for a facility to be developed within north-central West Virginia.  The result of those discussions was the execution of the Lease on or about July 21, 2022, which Lease contemplated the design, construction, development and lease of a to-be-built-to-suit distribution and light manufacturing center for use by O&M (the "Project"), to be located on a raw, undeveloped parcel of land off located off of Pitman Road in an unincorporated area outside of Morgantown, West Virginia ("Property").

15.      Pursuant to the Lease, O&M was required to pay a "Base Rent" over the course of the lease term, and the parties agreed the Base Rent would be calculated upon the final cost of construction, which would only be known and reconciled after (a) O&M provided design direction

and specifications, (b) WRCCD was thereafter able to complete the design to O&M's specifications, (c) O&M approved WRCCD's custom design, and (d) thereafter WRCCD was able to complete the development and construction of the site and building pursuant to the O&M approved, custom design.

16.     These terms are typically and generally referred to as a "rent constant," and are typically agreed upon in build-to-suit projects in which a tenant's program and design has not yet progressed to a point that the total cost could be accurately estimated, or fixed, by a landlord or developer but in which the tenant nonetheless wishes for the project to proceed and is willing to enter into a binding lease to allow it to proceed.

17.     The Lease provided for relatively limited obligations of WRCCD relating to timeline, schedule, and milestones (which milestones would be appropriately extended for any delay by Tenant in providing design direction, review, and/or approval); in particular, WRCCD's obligations relating to the project timeline were simply "to diligently pursue Substantial Completion..."

18.     The Lease further provided that the payment of rent by O&M to WRCCD will not commence until the Substantial Completion of the Project, or the date which Substantial Completion of the Project would have occurred absent a delay caused by O&M.

19.     Notably, the Lease also provided that even if WRCCD does not achieve Substantial Completion by the date indicated on the Milestone Schedule (February 24, 2024), and even if Tenant's actions or inactions were not the cause for delay, there is no penalty imposed on WRCCD – only that rent commencement is delayed on a day-for-day basis until Substantial Completion occurs.

20.     Further, the Lease provides very limited and specific remedies to Tenant "if WRCCD fails to diligently pursue Substantial Completion," and omitted any right for Tenant to terminate the Lease.

21.     The Lease also includes a unique and interesting, but clear and reasonable (given the context) provision regarding the Project's schedule on its first page. In Section 1.b.i, it reads: "[O&M] and [WRCCD] agree the targeted Commencement Date is December 1, 2023, but the "Milestone Schedule" set forth in Landlord's Work, Addendum 5 does not achieve the targeted Commencement Date of December 1, 2023."

22.     The circumstances leading up to the Lease's execution shed light on the Parties' rationale behind the Lease's primary terms – and in particular, a Lease provision whereby the Parties agree to a target Substantial Completion date never aligned with the Lease's Milestone Schedule from the outset, even at lease execution.

23.     O&M's interaction with WRCCD from the Project's inception to Lease signing involved a protracted process of O&M routinely soliciting multiple revisions to concurrent, alternate proposals without O&M progressively narrowing its options or incrementally making any fundamental program or legal structure decisions to allow the Project's design to commence.

24.     Despite O&M's prolonged deliberation and constant position indicating their desire to move quickly so to meet WVU Medicine's desired timeline for the Project, fundamental decisions such as building size and deal structure remained undecided by O&M until March of 2022.

25.     Initially, O&M's Sales & Operations Team (those at O&M tasked with landing the WVU Medicine contract) spearheaded communication with WRCCD.  Such representatives would indicate to WVU Medicine that negotiations and pre-construction activities with WRCCD were

underway in order to meet WVU Medicine's desired completion date for the facility of December 1, 2023.

26.     Upon information and belief, however, miscommunication within O&M, particularly between departments, led to inconsistencies and delays in decision-making, such that not a single major decision was provided to WRCCD in 2021.

27.     For example, in October 2021, O&M's real estate department directed its external real estate agents to engage with the WRCCD.  Communication with WRCCD immediately indicated that O&M's real estate department was unaware of the prior request for proposals sent out by O&M Sales & Operations Team.  The brokers sent WRCCD what they described as the standard form of O&M's request for lease proposal, and requested that WRCCD complete and return the same to O&M in an expedited fashion, also citing the need to move the project quickly to meet WVU Medicine's desired timeline.

28.     While the format of these new proposal requests was different than those which came from the O&M Sales & Operations Team, all O&M parties were consistent in telling WRCCD to assume imminent decision making by O&M regarding the pending fundamental decisions. Such pending fundamental decision points included items such as:

a.     the total building square footage (WRCCD had been requested to provide multiple proposals for various size buildings);

b.     whether the Project would be LEED certified or not (WRCCD had been requested to provide various detailed pricing options despite the early state of design);

c.     whether the Project would have one or two access roads; and

d.     whether the Project would be single or double loaded with dock doors.

14

29.     O&M unfortunately continued to fail to meet its own desired timelines for making these decisions, which continued to further delay any ability for any party to make meaningful progress on the pre-construction of the Project.

30.     Indecision and internal communication breakdowns within O&M persisted, which was evident in subsequent exchanges and seemingly exacerbated by the expectation O&M set with WVU Medicine that the Project's pre-construction and negotiations were proceeding, that execution of a lease with WRCCD was to be expected in 2021, and the Project's completion by December 2023 remained realistic.

31.     In November 2021, following a period without communication from O&M, WRCCD sent O&M notice that it had chosen to idle the third-party consultants which it had engaged in a rapid manner to respond to O&M's requests in the prior month. O&M brokers wrote back that "O&M is continuing to work on the business opportunity with the hospital …  I am guessing we are in a Q1 lease signing window at this point so perhaps not necessary to immediately re-start with the consultants."

32.     Unfortunately, that decision, or continued indecision, which O&M's broker sent to WRCCD had obviously not been shared with WVU Medicine, and WVU Medicine and O&M executed their agreement in November 2021.

33.     WRCCD would later learn that agreement continued to include the provision that the facility would be open by December 2023. A senior representative of WVU Medicine also emailed a WRCCD representative directly at the end of November 2021 stating "Our agreement is executed with them but requires them to build within the state. I will be pushing this issue this week to get the lease settled," clearly illustrating there was a disconnect between the expectations set by O&M with WVU Medicine and O&M's progress in decision making.

15

34.     In December 2021, communication between WRCCD and O&M was sparse, other than O&M's broker beginning to indicate that O&M had developed a likely preference (but notably not a decision) to purchase the building upon completion (as opposed to the build-to-suit lease transaction that O&M did ultimately select and the parties entered into the Lease regarding), and an opinion that the site preparation costs of WRCCD's site, and other sites in the region, were making the project financially challenging and therefore O&M would need to focus on seeking incentives from the State of West Virginia.

35.     In January 2022, it was announced that the West Virginia Department of Economic Development (WVDED) would award O&M a grant in the amount of fifteen million dollars ($15,000,000) for the Project. O&M representatives would subsequently tell WRCCD that such amount was significantly more than O&M had expected, that it had been negotiated based upon the high sitework costs of the Project, and that the amount of award would further incentivize O&M to purchase the building upon completion given O&M's initial expectation that WVDED would require the grant funds be expended on real property, similar to other economic development incentive deals O&M had received in other states.

36.     With its larger than expected grant in hand, O&M re-engaged with WRCCD in the first quarter of 2022, and once more requested that multiple concurrent proposals (for lease & sale options; 300,000 sf and 350,000 sf options; LEED and no LEED options) be developed by WRCCD and its consultants and delivered to O&M in an expedited fashion.

37.     WRCCD met O&M's requested expedited timelines once more, which is what presumably led to O&M representatives making remarks to local economic development officials regarding O&M's very positive impressions on the responsiveness and competency of WRCCD,

16

comparing the level of transparency of the proposals to others received nationwide and stating "this is what we always want, and never get."

38.     During an in-person meeting in Morgantown during February 2022, WRCCD, O&M representatives, and O&M's brokers reviewed WRCCD's prior proposals and agreed upon several assumptions future proposals should assume before being submitted to O&M's executives – primarily designed to address the risk of the unknown scope of the Project given the still outstanding design decisions.

39.     It was also during this meeting when O&M representatives indicated to WRCCD that based upon O&M's discovery, much to O&M's surprise, that WVDED would not require O&M to spend their grant money directly on real property improvements, O&M would very likely revert back to selecting the build-to-suit lease option, thereby having WRCCD fund the cost of the real property improvements, and O&M choosing to spend its grant funds on other uses.

40.     Also in this meeting, O&M real estate representatives openly accepted that it would be unlikely for any party to meet the O&M Sales & Operation Team's previously committed date of December 1, 2023 to WVU Medicine, and that O&M would need to decide to either pay the penalty in the contract to WVU Medicine from their own funds, or request WRCCD to include a line item in its budget to fund such amount.

41.     And lastly during this meeting, O&M acknowledged and agreed that given all major decisions remained undecided or pending at that time and were expected to remain pending by O&M until at least late March, combined with the fact that O&M was requesting WRCCD to move forward with the execution of a lease as quickly as possible in order to show progress to WVU Medicine, it would be appropriate for the lease to include terms materially similar to the primary terms which ended up in the executed lease regarding rent constant, limited schedule and timeline

obligations, and especially the lack of any termination right by O&M given WRCCD would be moving forward with expending significant funds.

42.     During this in-person meeting, O&M representatives were finally optimistic that they may be able to select just one building size for WRCCD to provide an updated proposal for approval by O&M's executives in March, and committed to follow up direction on that chosen building size to be sent by email. All parties recognized and agreed that would be a step in the right direction to being able to kick off detailed design work.

43.     On March 2, 2022, O&M's broker emailed WRCCD and provided the latest direction on building size: O&M still desired to continue to keep multiple options open, and requested that WRCCD once again provide two updated proposals – one for a 300,000 sf building and one for a 350,000 sf building.

44.     WRCCD complied with the request and re-submitted two proposals to O&M representatives one week later, on March 9, 2022.  O&M's broker responded the same day, stating "O&M is very appreciative of the detail and your efforts to resize and reprice!!"

45.     On March 29, 2022, O&M emailed WRCCD and indicated that the 350,000 sf option was selected, however other fundamental program decisions such as LEED certification as well as even the lease versus buy decision remained technically undecided.  O&M indicated that it expected its board to approve the lease (versus buy) recommendation, but that decision, as well as the LEED decisions, may not be made for up to thirty days and was subject to input by other departments, boards, and committees.

46.     The O&M representative requested that WRCCD begin drafting a lease for O&M's review in the interim of that final confirmation, as O&M desired to execute the lease as quickly as

possible once a final decision was made, given that the pressure from WVU Medicine to see progress.

47.     In April 2022, despite the long outstanding fundamental decisions having not yet been confirmed as final by O&M, the O&M Sales & Operations Team began contacting WRCCD inquiring when they could schedule a groundbreaking date, which WVU Medicine was requesting. Ironically, to comply with other O&M representatives' request to begin drafting a lease, WRCCD had also begun compiling exhibits to attach to the Lease. As evidence of the months-long deliberation by O&M over the basic programming decisions, the eventual executed Lease's document log would only include a total of five (5) pages of architectural plans, a total of fifteen (15) pages of civil grading plans, and no completed geotechnical report.

48.     On April 19, 2022, representatives of WRCCD would once again remind O&M that it was critical to the design schedule for O&M to confirm certain design assumptions such as LEED certification, building dimensions. Around the same time, it appeared to WRCCD that more effort was spent on planning the groundbreaking than making fundamental decisions to allow the design to proceed.

49.     On June 27, 2022, before the Lease was executed, a groundbreaking was held.  The local newspaper, the Dominion Post, reported on the groundbreaking event, quoted senior WVU Medicine and O&M officials, and reported that construction would be complete in late 2023.

50.     The Lease was executed several weeks later.

51.     During the weeks leading up to the Lease execution, representatives of WRCCD and O&M negotiated the language in Section 1 regarding schedule, and the Parties communicated that while O&M needed to include the December 1, 2023 date for "internal reasons" previously discussed, it would not align with the Milestone Schedule attached to the Lease.

19

**Despite O&M's Failure to Provide the Requisite Inputs and Approvals,
WRCCD Moved Forward with Site Preparation**

52.     Following the execution of the Lease, from the very outset, and in breach of its duties and obligations under the Lease, O&M repeatedly failed to timely provide WRCCD with required information, inputs, decisions, and approvals as to the Project in order for WRCCD to proceed with the completion of the design and procurement of subcontractor pricing.

53.     Indeed, O&M concedes in Paragraph 16 of its Complaint that "almost immediately after executing the Lease," WRCCD requested additional design input from O&M.

54.     Unfortunately, O&M's indecision, requests for changes and general lack of participation prevented WRCCD from progressing past the earliest phases of the Project as O&M failed to finalize and approve the construction drawings in breach of the Lease and despite diligent and consistent follow up from WRCCD.

55.     Despite O&M's continued delays in providing necessary inputs and approvals for building design, WRCCD was steadfast in its efforts to continue moving forward with the Project in any way that it could, including performing portions of mass earthwork design which were not wholly dependent on O&M's pending design inputs and decisions.

56.     With O&M's consent, WRCCD had previously engaged Terradon, a civil engineering firm, to perform the geotechnical investigations and recommendations for the Project.

57.     Terradon produced its geotechnical report in the Summer of 2022, following the execution of the Lease.  In its report, Terradon identified certain subsurface issues, and proposed solutions and remedies to stabilize and prepare the ground for construction.

58.     Consistent with the terms of the Lease, WRCCD presented Terradon's findings to O&M along with the cost of implementing Terradon's proposed solutions, which was significantly more than the budgeted amount.  WRCCD sought O&M's direction regarding whether O&M

wanted WRCCD to implement Terradon's proposed solutions and remedies or, in the alternative, whether O&M wanted WRCCD to consult with a different geotechnical engineer with which it was familiar and had preliminarily expressed an opinion that would likely lead to alternative solutions and ultimately less costly site preparation work.

59.     O&M instructed WRCCD to pursue the second option, so WRCCD engaged a second geotechnical engineering firm, Triad, to conduct a peer review of Terradon's work at WRCCD's expense.

60.     In January 2023, Triad recommended more cost-effective solutions and remedies.

61.     O&M's direction to, and approval of, WRCCD seeking the second geotechnical opinion in order to reduce cost, delayed the ability for the mass earthwork package to commence by months – a fact of which O&M was acutely aware of and had independently communicated to WVU Medicine, which in turn provided the same reason for the delayed commencement of sitework to local press.

62.     With the full knowledge and consent of O&M, and in an effort to respond to O&M's requests to WRCCD to keep the Project visibly moving forward to appease WVU Medicine, WRCCD performed the site preparation work that was not design-dependent.  From the execution of the Lease until the completion of Triad's report, WRCCD engaged Anderson Excavating to perform mobilization, clearing and grubbing, and the installation of certain erosion and control measures which were not design dependent.

63.     Then, almost immediately following the receipt of Triad's report, and with the approval of O&M, WRCCD provided a notice to proceed to Anderson Excavating, LLC to perform the portion of the mass excavation that, with Triad's report in hand, could commence.

64.     WRCCD continued to perform its obligations under the Lease and attempted to move forward with its work on the Project to the extent possible, notwithstanding that the parties contemplated adjustments to the rental amount necessitated by O&M's delay.

65.     In fact, O&M's delays were so significant that, in or around December of 2022, in recognition of its delays, O&M agreed to engage in discussions with WRCCD regarding an increase of the "Base Rent" outlined in the Lease.

**Progress Came to a Halt as O&M Still Failed to
Provide Necessary Approvals and Decisions**

66.     While the Lease was entered into on July 21, 2022, it was not until almost a year later that O&M finally provided information sufficient for WRCCD's architect to be able to complete and submit a set of progress plans to O&M for its review and approval.

67.     Those progress plans were submitted by the architect to WRCCD and O&M on or about May 15, 2023.

68.     Despite WRCCD following up with its comments regarding the progress plans on or about June 8, 2023, O&M never responded with any specific comments nor approvals.

69.     Causing even further delays, O&M had by then instead chosen to begin revisiting a variety of fundamental building specification decisions, including for example the inclusion or exclusion of specialty warehouse space, evaluating changing the height of the building, the orientation of the building, and even revisiting the total square footage of the building.

70.     Throughout the Project, O&M constantly revisited fundamental decisions often reverting back to versions of the building that it had previously ruled out, with further contributed to ongoing delays that prevented WRCCD from proceeding.

71.     Despite WRCCD's efforts to move forward with whatever non-design-specific work it could, eventually O&M's failure to make certain critical decisions caused the Project to grind to a halt.

72.     Likewise, O&M's failure to make these critical design decisions prevented WRCCD from closing construction financing.

73.     Indeed, the construction financing required O&M-approved building plans that were specific enough to reasonably assure a lender that the basic parameters for the Project had been agreed upon, designed, and contracted for by subcontractors. Every construction schedule exchanged between WRCCD and O&M had detail showing this sequence of events occurring at the beginning of the Project, with only limited site preparation work commencing before the completion of building design, and completion of the procurement of the majority of the subcontracts.

<u>**O&M Was Aware of the Effects of its Indecision and**</u>
<u>**Sat Idle Until WVU Medicine Applied Pressure**</u>

74.     O&M consistently acknowledged the fact that estimated completion dates and the Project timeline in general was being negatively affected by its indecision, actions, and inactions.

75.     Despite O&M's persistent delays, WRCCD remained cooperative throughout the Project, and, in fact, O&M's agents were nothing but complimentary of WRCCD's diligent efforts to keep the Project moving forward.

76.     Upon information and belief, in the Summer of 2023, as more time passed and O&M continued to feel pressure from WVU Medicine, O&M sought to scapegoat WRCCD in an attempt to explain the Project's delays, which O&M itself caused.

77.     To that end, O&M asked WRCCD if it would consider selling the Property to a third party or entering into a joint venture with different developers – two options that O&M could

take to WVU Medicine along with a false narrative that WRCCD was to blame for the Project's problems and that O&M had devised a solution to solve those problems.

78.     Subsequent discussions between O&M and WRCCD similarly crawled along as O&M failed to communicate with WRCCD for weeks at a time, consistent with its behavior throughout the Project.

79.     Nonetheless, WRCCD was accommodating and cooperative during these discussions, and explored options at O&M's request, expending significant time and expense to do so.

80.     Notably, each of these proposals likewise required the fundamental specification decisions, which O&M still had not made, and the completions of the plans as a precedent to financing being closed.

81.     In an effort to address O&M consistently changing its position and refusing to progress with Project, WRCCD logged over 160 manhours over the course of many weeks to engage in discussions with third-party developers.  Demonstrating its commitment, WRCCD these efforts were prioritized over WRCCD's other ongoing projects, which further demonstrated its dedication to moving forward with the Project.

82.     The restructuring negotiations culminated in an August 28, 2023 letter from WRCCD to O&M outlining a number of issues, including, but not limited to, Project progress, outstanding design decisions, WRCCD's financing, increasing interest rates and proposed joint-venture restructuring.

83.     Importantly, in that letter, WRCCD unequivocally conveyed its decision to move forward with the Project. Indeed, WRCCD told O&M that "[WRCCD] remains fully dedicated to

24

the successful execution of this project" and that "[WRCCD] continues to be willing to consider all alternatives proposed by [O&M] to address the unexpected challenges that have arisen."

**O&M Sent Its "Default Notice" to WRCCD as a
Pretext to Get Out of Its Obligations Under the Lease**

84.     A few weeks later, on September 18, 2023, O&M sent WRCCD a "Default Notice", stating that it intended to unilaterally terminate the Lease.

85.     The "Default Notice" set forth that "Pursuant to Section 1(b)(ii) of the Lease, [O&M] has on numerous occasions consulted with [WRCCD] on the status of the Substantial Completion of [WRCCD's] Work," and that based on these discussions and the current status of the work, it was clear that WRCCD would not be in a position to substantially complete the work by the targeted Substantial Completion date of December 1, 2023.

86.     O&M concluded in its "Default Notice", without examples, that WRCCD failed to diligently pursue the Substantial Completion of the work as required under Section 1(b) of the Lease and that such failure would result in Substantial Completion occurring after February 29, 2024.

87.     The "Default Notice" also claimed, without support, that WRCCD failed to obtain financing in contradiction of its representation set forth in the Lease.

88.     Finally, O&M stated that, pursuant to Section 25(a) of the Lease, WRCCD would have thirty (30) days from receipt of the Notice to "cure the defaults" set forth therein.

89.     According to Section 25(a) of the Lease, WRCCD would be in default if WRCCD failed to perform any of its obligations under the Lease within thirty (30) days after notice from O&M specifying such failure.  However, where any such failure could not reasonably be cured within a thirty (30)-day period, WRCCD would not be in default if WRCCD commenced to cure

the failure within the thirty (30)-day period and thereafter diligently pursued all reasonable efforts to complete the cure.

90. WRCCD responded to the "Default Notice" on October 10, 2023, denying the totality of O&M's allegations and further denying that WRCCD was in default of its obligations under the Lease.

91. As it informed O&M, WRCCD had at all times engaged in diligent efforts to complete the Project and those efforts were nothing short of exhaustive given O&M's constant and material delays.

92. Importantly, O&M's failure to make timely decisions and execute approvals, which were necessary to complete the construction plans for the Project and allow WRCCD to close on its construction financing prevented WRCCD from being in a position to substantially complete the work by the targeted Substantial Completion date.

93. O&M was aware of that fact long before September 18, 2023, when it sent the Notice.

94. O&M induced WRCCD to continue working on the Project, knowing full-well that O&M was the cause of the delays and at no time did O&M suggest that it was planning to back out of the Lease or allege that WRCCD was in default of the Lease due to O&M's own failures.

95. O&M sent the "Default Notice" as a pretext and purported to provide thirty (30) days for WRCCD to cure the alleged defaults knowing full well that it was O&M's own conduct, not that of WRCCD, that was improper and in violation of the parties' agreement.

96. By O&M's failure to make the necessary decisions and to act in good faith, in breach of the Lease, O&M created the very delays with which they now take issue.

97.     In summary, knowing that it caused the material delays with its inaction and indecision, O&M sought to get out of the Lease and fabricated WRCCD's alleged default as a pretext.

98.     All the while, WRCCD had taken on significant costs towards the completion of the Project in excess of $75,000, including, but not limited to, excavation fees, mobilizations costs, management and staffing fees, architect fees, geotechnical engineer fees and nonrefundable deposits.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract – Damages)**

99.     WRCCD incorporates by reference each of the foregoing paragraphs of its Counterclaim as if set forth at length herein.

100.     WRCCD and O&M executed the Lease pursuant to which WRCCD would construct a build-to-suit commercial building with certain specifications for O&M and O&M would pay WRCCD rent over the course of the ten-year term of the Lease to compensate WRCCD for the construction and O&M's subsequent occupancy.

101.     Because the building was to be constructed in accordance with O&M-specific design criteria, the Lease expressly required O&M's active participation, timely decision making and prompt approvals so that WRCCD could ultimately construct the building accordingly.

102.     In breach of its obligations under the Lease, O&M failed and refused to provide the requisite approvals to enable WRCCD to continue forward with its construction of the building for O&M.

103.     Specifically, O&M's actions and inactions outlined in detail above, including but not limited to its failure to approve construction drawings, its constant indecision with regard to

fundamental specifications and its requests for change orders, prevented WRCCD from constructing the commercial building for O&M's subsequent lease.

104.    On top of that, O&M now seeks to get out of its obligations under the Lease including but not limited to its obligation to submit rental payments to WRCCD in order to cover its costs of construction (including the costs and charges already incurred by WRCCD) as well as to compensate WRCCD for the rental income it was to receive during the term of O&M's occupancy under the Lease.

105.    As a result of O&M's breaches, WRCCD has suffered and will continue to suffer damages in excess of $75,000, including, but not limited to, excavation fees, mobilizations costs, management and staffing fees, architect fees, geotechnical engineer fees, nonrefundable deposits, rent due under the Lease and other lost profits.

WHEREFORE, WRCCD demands judgment in its favor against O&M in an amount in excess of $75,000 plus attorneys' fees, costs, and expenses incurred in this action, pursuant to Addendum 3, Section 21 of the Lease, and for such other and further relief as the Court deems to be just and proper.

## SECOND CLAIM FOR RELIEF
### (Anticipatory Repudiation – Damages)

106.    WRCCD incorporates by reference each of the foregoing paragraphs of its Counterclaim as if set forth at length herein.

107.    WRCCD and O&M executed the Lease pursuant to which WRCCD would construct a build-to-suit commercial building with certain specifications for O&M and O&M would pay WRCCD rent over the course of the ten-year term of the Lease to compensate WRCCD for the construction and O&M's subsequent occupancy during the term of the Lease.

108.     Because the building was to be constructed in accordance with O&M-specific design criteria, the Lease expressly required O&M's active participation, timely decision making and prompt approvals so that WRCCD could ultimately construct the building accordingly.

109.     In breach of its obligations under the Lease, O&M failed and refused to provide the requisite approvals to enable WRCCD to continue forward with its construction of the building for O&M.

110.     After improperly and unfairly preventing WRCCD from moving forward with the Project, O&M sent a "Default Notice" to WRCCD to get out of paying rent.

111.     Through this "Default Notice", O&M conveyed that it would not perform its obligations under the Lease and stated that it intended to unilaterally terminate the Lease.

112.     In so doing, O&M absolutely repudiated its obligations under the Lease without just excuse.

113.     O&M's repudiation was without just excuse because its assertions that WRCCD was in default were and remain completely without merit and instead constitute a pretext for O&M to seek to be excused from its obligations under the Lease.

114.     As a result of O&M's repudiation, WRCCD has suffered and will continue to suffer damages in excess of $75,000, including, but not limited to, excavation fees, mobilizations costs, management and staffing fees, architect fees, geotechnical engineer fees, nonrefundable deposits, rent due under the Lease and other lost profits.

WHEREFORE, WRCCD demands judgment in its favor against O&M in an amount in excess of $75,000 plus attorneys' fees, costs, and expenses incurred in this action, pursuant to Addendum 3, Section 21 of the Lease, and for such other and further relief as the Court deems to be just and proper.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract – Specific Performance)

115.    WRCCD incorporates by reference each of the foregoing paragraphs of its Counterclaim as if set forth at length herein.

116.    WRCCD and O&M executed the Lease pursuant to which WRCCD would construct a build-to-suit commercial building with certain specifications for O&M and O&M would pay WRCCD rent over the course of the ten-year term of the Lease to compensate WRCCD for the construction.

117.    WRCCD fulfilled its obligations under the Lease.

118.    WRCCD has repeatedly conveyed that it is ready, willing, and able to perform under the Lease.

119.    For example, in its August 28, 2023 letter, WRCCD clearly conveyed its intention to move forward with the Project.  Indeed, WRCCD told O&M that "[WRCCD] remains fully dedicated to the successful execution of this project" and that "[WRCCD] continues to be willing to consider all alternatives proposed by [O&M] to address the unexpected challenges that have arisen."

120.    In addition, by its response to O&M's "Default Notice", WRCCD confirmed that "[WRCCD], with [O&M's] cooperation, has a clear path forward to deliver a completed project. [WRCCD] has not defaulted and is committed to working toward Substantial Completion."

121.    Conversely, O&M has failed and refused to perform its obligations under the Lease and has clearly conveyed that is has no intention of ever performing its obligations under the Lease without intervention.

WHEREFORE, WRCCD demands judgment in its favor against O&M compelling O&M to perform its obligations under the Lease including providing necessary approvals, compensating

WRCCD for the construction work that has been done, paying future rent for the agreed-upon ten-year term and reimbursing WRCCD for attorneys' fees, costs, and other expenses incurred in this action, pursuant to Addendum 3, Section 21 of the Lease.

### PRAYER FOR RELIEF

WHEREFORE, WRCCD respectfully requests judgment be entered in its favor and against O&M with respect to WRCCD's foregoing Counterclaims as follows:

(a) In accordance with WRCCD's First Claim for Relief, judgement in an amount in excess of $75,000 plus attorneys' fees, costs, and expenses incurred in this action and such other and further relief as the Court deems to be just and proper;

(b) In accordance with WRCCD's Second Claim for Relief, judgement in an amount in excess of $75,000 plus attorneys' fees, costs, and expenses incurred in this action and such other and further relief as the Court deems to be just and proper;

(c) In accordance with WRCCD's Third Claim for Relief, an order compelling O&M to perform its obligations under the Lease, including providing necessary approvals, compensating WRCCD for the construction work that has been done, paying future rent for the agreed-upon ten-year term and reimbursing WRCCD for attorneys' fees, costs, and other expenses incurred in this action; and

(d) Judgment for such other relief as the Court, in the exercise of its discretion, deems just and proper.

Dated:  April 4, 2024                    Respectfully submitted,

                                         BUCHANAN INGERSOLL &
                                         ROONEY LLP

                                         /s/ *Kathleen Jones Goldman*
                                         Kathleen Jones Goldman
                                         WV No. 6917
                                         Jordan M. Webster
                                         WV No. 14114
                                         Union Trust Building
                                         501 Grant Street, Suite 200
                                         Pittsburgh, PA 15219-4413
                                         Phone: (412) 562-8800
                                         Fax: (412) 562-1041

kathleen.goldman@bipc.com
jordan.webster@bipc.com
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument has been

electronically filed with the Clerk of Court using CM/ECF on April 4, 2024 and a copy of same

will be served by the E-Filing Portal via E-mail upon counsel or parties registered on the

CM/ECF system.


<u>/s/ *Kathleen Jones Goldman*</u>
Kathleen Jones Goldman
WV No. 6917
*Attorney for Defendant*